THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICHARD TALASCH, Defendant-Appellant.

(No. 58442;

First District (4th Division)—June 12, 1974.

James J. Doherty, Public Defender, of Chicago (John T. Moran, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, Jerald A. Kessler, and John F. Brennan, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendant, Richard Talasch, was charged by an indictment with burglary and rape. Following a bench trial, he was found guilty of both offenses and sentenced to two concurrent terms of 20 to 40 years in the Illinois State Penitentiary. He appeals from this judgment, contending that he was deprived of adequate representation by competent counsel, that he was not proven guilty beyond a reasonable doubt, and that his sentences are excessive.

We direct our attention first to the contention that he was not proven guilty beyond a reasonable doubt. With respect to the charge of rape, the State was required to prove that the accused had sexual intercourse with the complainant by force and against her will. (Ill. Rev. Stat. 1973, ch. 38, par. 11—1.) Susan Goodridge, the complainant, testified that on February 9, 1972, she was ill and stayed home from work. She lived with her parents in a two-story house at 642 South East Avenue in Oak Park. At about 12:30 in the afternoon, she was talking on the telephone to a friend, Mrs. Ryczek, when she heard a noise downstairs. She put down the phone and went downstairs to investigate, where she encountered the defendant. She had never seen him before. She asked who he was and what he wanted, and he stated that he had entered the house because someone was chasing him.

He grabbed her and forced her into the kitchen. She asked him how he had gotten into the house and he showed her where he had broken the glass in the back door. In the kitchen she saw a second man who she identified in court as Thomas Haymes, the codefendant. She broke away from the defendant and ran into the dining room, but he followed her and knocked her down. He told Haymes to look around the first floor and forced her up the stairs.

Upstairs, he dragged her into her sister's bedroom and told her to take off her clothes. When she refused, he pushed her down on the bed, pulled down her underpants, and lifted up her nightgown. He then took off his trousers and had sexual intercourse with her. During this time she was screaming and fighting him, and he stuffed part of a blanket into her mouth to quiet her.

When he finished having intercourse with her, he demanded money. She gave him a handful of change from her purse, but he wanted more. She said there was more in the kitchen, and he forced her downstairs. In the kitchen, he threw her down on the floor. She looked through the glass in the back door and saw a police officer. She screamed for help, and the officer ran in and chased the defendant out the front door.

A neighbor came over, and she told the neighbor that she had been raped. The police officer returned with the defendant in handcuffs, and she told the officer that the defendant had raped her. She was taken to

West Suburban Hospital, where a smear test for the presence of sperm proved positive. She was also treated for a cut, and it was discovered that her leg was bruised. It was stipulated at trial that a police laboratory report revealed the presence of blood on the defendant's jockey shorts and blood and sperm on the complainant's nightgown.

Mrs. Rose Ryczek testified that about 12:30 P.M. on February 9, 1972, she was talking to Susan Goodridge on the telephone. While they were talking Susan said she heard something in the house downstairs. They had been talking on the phone about 15 minutes and she thought Susan was imagining things. Susan again said she thought she heard something. Susan told her to stay on the phone, and she was going to look. The next thing she heard her yelling and screaming "Who are you, who are you?" She then called the Oak Park Police.

Officer Joseph Ferraro testified that on February 9, 1972, at about 1:30 P.M., he went to 642 South East Avenue in response to a radio call concerning a burglary in progress. He found that the window in the back door had been broken. He looked in and saw the defendant holding Susan Goodridge around the neck. She screamed that the defendant had raped her, and he went in. As he did so, the defendant ran out the front door. He chased the defendant into a gangway and arrested him.

Patricia Talasch, the defendant's wife, testified for the defense. She stated that in January, 1972, she was going through her husband's pockets preparing his clothes for the laundry when she found a piece of paper with Susan Goodridge's name, address and telephone number on it. She drove by Susan's house once, but did not see anyone, and later she threw the paper away. In March of 1973, she showed a picture of the defendant to five or six persons in the Cherry Lounge and to the bartender at the Atlantic Lounge. One of the people in the Cherry Lounge was Ethel Buckley, who agreed to testify at the trial.

Ethel Buckley testified that she was in the Cherry Lounge in March of 1973 when Mrs. Talasch came in with the defendant's picture. Mrs. Talasch was pregnant and was crying. She told her that her husband was involved with another woman and was facing a rape charge. She felt sorry for Mrs. Talasch and agreed to testify at her husband's trial.

She further testified that in late January, 1972, she was in the Atlantic Lounge with her boyfriend, whose name she recalled, with some hesitation, as John Brown. She saw the defendant in the company of a tall blond woman, who she identified at trial as Susan Goodridge. She stated that she was in the lounge for about an hour, during which she looked at Miss Goodridge for about 5 minutes while Miss Goodridge's back was facing her. She had "three or four drinks during this period, and the lighting in the lounge was dim. She had never been to the Atlantic Lounge

before the night that she saw the defendant and has not been there since, although it is just around the corner from the Cherry Lounge. She had never been to the Cherry Lounge before the day that she encountered Mrs. Talasch.

The defendant testified in his own behalf. He stated that he met Susan Goodridge for the first time at the Atlantic Lounge in late January, 1972. They talked for a while and he drove her home. She wrote down her name, address and telephone number on a piece of paper and gave it to him. Two days later he found the paper on his dresser and called her for a date the following week-end. On that occasion they returned to the Atlantic Lounge and also went to the Cherry Lounge. They drove to her house, where they kissed a few times in the car before he dropped her off.

On February 9, 1972, he telephoned her around 8 A.M. and she told him to stop by that afternoon if he wasn't doing anything. He stayed home from work that day to look for a better job. He went out job hunting with his friend, Thomas Haymes. They went to several places, but around noon the defendant became discouraged when a former employer told him that he could not be rehired and decided not to look further. Since he was in the vicinity of Susan Goodridge's house, he decided to go there.

When he arrived at the house, Susan came to the door in her nightgown and invited him in. After a discussion, Haymes decided to continue looking for a job and left. Susan took the defendant on a tour of the house, and while they were in one of the upstairs bedrooms they began kissing. They both undressed and had intercourse, after which he took a shower. They had a conversation in which he revealed that he was married, and Susan became very upset and began screaming and crying. They went back downstairs into the kitchen, and he put his arms around Susan's neck to kiss her. At this time he saw Officer Ferraro through the back door. He became frightened because he thought the officer might be Susan's boyfriend. When Susan screamed to the officer that he had raped her, he fled because he was on probation for armed robbery.

■■ The defendant contends that the above testimony was not sufficient to prove him guilty of rape beyond a reasonable doubt. He argues that the uncorroborated testimony of the complainant did not establish that he used force in having intercourse with her and points out that the mere fact of intercourse between the complainant and himself does not, of itself, establish that a rape occurred. *People v. Henderson* (1970), 119 Ill.App.2d 403, 256 N.E.2d 84.

After hearing all of the evidence in the present case, the trial court made the following observation:

"Before prefacing my remarks I would say that in the first time in fifteen years since I have been in this building I have been embarrassed, embarrassed in our system of criminal justice. The defendant's affirmative defense, if you want to call that an affirmative defense of consent not only fails to raise any reasonable doubt, but I was convinced that it was contrived, I was convinced it was perjured. It is thoroughly embarrassing for the administration of justice."

After reviewing the record, it is our conclusion that the trial court's remarks are justified.

At the outset, we disagree with the defendant's characterization of the complainant's testimony as "uncorroborated". Her description of the incident was corroborated by Officer Ferraro, who stated that he observed the broken glass in the back door, by Mrs. Ryczek, who testified that the complainant told her of hearing a noise downstairs and that shortly after this she heard the complainant's screams over the telephone and she called the police, and by the laboratory reports, which showed the presence of blood on the defendant's underwear and blood and sperm on the complainant's nightgown. Furthermore, the complainant's testimony was positive and detailed, and that of the defense witnesses vague and contradictory.

■■ We are aware of the maxim that a charge of rape is easy to make and difficult to disprove. We are also aware that reviewing courts are charged with a particular duty of care in examining the evidence in rape cases. The issue in the present case, however, is actually one involving the credibility of witnesses. The trial court found that the complainant was credible and the defense witnesses, including the defendant, incredible. After having reviewed the record carefully, we are convinced that the trial court's findings have an ample basis and that the evidence of the defendant's guilt is overhelming.

■■ With respect to the burglary conviction, we find no merit to the defendant's contentions that he was not proven guilty beyond a resonable doubt because there were no fingerprints on the back door or broken glass and because nothing was recovered from his person that would indicate that he stole anything. The absence of fingerprints is easily accounted for by the hypothesis that an object was used to break the glass. The crime is complete upon entry with the intent to steal (*People v. Barge* (1972), 7 Ill.App.3d 721, 288 N.E.2d 492), and the State was not required to show that the accused actually took anything.

■■■ We next consider whether the defendant was represetned by competent counsel. In arguing that his counsel was incompetent, the defendant objects primarily to the failure of his court-appointed attorney to make a pre-trial motion to suppress his statements to the police. The record reveals that the attorney representing co-defendant Haymes made such a motion, and the court denied it. Following this, Talasch's attorney moved to sever the defendant's trial from that of Haymes and was successful. When the State sought to introduce the statements into evidence during the trial, the defendant's attorney objected, and the court sustained the objection. Thus, the statements were never admitted into evidence. Before a conclusion of inadequate representation can be reached, it must be shown both that the defendant's counsel was in fact incompetent and that the incompetence resulted in a substantial prejudice to the defendant. (*People v. Harper* (1969), 43 Ill.2d 368, 253 N.E.2d 451.) Since the statements were never admitted into evidence, we do not see how the failure to make a pre-trial motion to suppress could have prejudiced the defendant. Furthermore, the defendant's attorney stated on the record that he was not making a pre-trial motion because he wanted to "take a particular tack." This indicates that he was aware of his opportunity to make the motion, but chose not to do so as a matter of strategy. As the State correctly points out in its brief, a review of the competence of counsel does not extend to areas involving the exercise of judgment or trial tactics. *People v. Martin* (1970), 44 Ill.2d 489, 256 N.E.2d 337.

■■ The defendant also contends that his attorney did not conduct an adequate pre-trial investigation of the case because he did not speak to Ethel Buckley until the morning of the trial, made no attempt to locate Pat Burnett, the former boyfriend of Miss Goodridge, and was unfamiliar with Officer Ferraro's police report when he attempted to impeach the officer on cross-examination. After reviewing the record, we reject this contention. The testimony of Ethel Buckley was uncomplicated and short and required no extensive preparation. She did not testify until the second day of trial, providing an ample opportunity to interview her prior to actually testifying. The failure to call Pat Burnett is, in our opinion, a matter of tactics and strategy. (See *People v. Scott* (1965), 63 Ill.App.2d 232, 211 N.E.2d 418.) Moreover, there is no showing that his testimony would have been favorable to the defense or even material to the issues in the case. Nor do we find any merit in the argument that the attempt to impeach Officer Ferraro reflected a lack of preparation. The difficulties experienced by the defendant's attorney in this area stemmed from the fundamental problem that the officers' testimony was consistent

with the substance of his report. Any ineffectiveness was due solely to the weakness of the defendant's case.

In addition to the foregoing, the defendant objects to "serious procedural errors" on the part of his attorney. He states that his attorney made motions to dismiss and for a new trial only after being prompted by the court. The record indicates, however, that immediately after the State rested its case, there was a recess. Following this, the defendant's attorney made a motion to dismiss off the record. When the trial resumed, the court reminded him to make his motion again for the record. With respect to the motion for a new trial, the court mentioned it immediately after its evaluation of the evidence, and thus there was no opportunity for the defendant's attorney to make the motion prior to the court's bringing it up.

■■ The defendant further argues that his attorney should have objected to the hearsay testimony by the complainant that the defendant told her that he entered the house because he was being chased and that the defendant said, "Didn't you hear the glass break?" when she asked how he got in. In our view these statements were not offered to establish the truth of the matter contained in them, but rather, to demonstrate the inconsistency between the complainant's version of how the defendant entered the house and his statement that he was invited in. Hence they were not objectionable. Furthermore, there are strategic reasons for not raising every conceivable objection to evidence, and therefore counsel's failure to object in the present case cannot be regarded as indicating a lack of competence.

■■ Finally, the defendant argues that his counsel's unfamiliarity with the theory of defense was demonstrated by his failure to make either an opening or a closing argument. It has been held that the waiver of an opening statement does not demonstrate incompetence. (*People. v. Georgev* (1967), 38 Ill.2d 165, 230 N.E.2d 851.) While we agree that the waiver of a closing argument might be prejudicial in some instances, we do not believe that it was in the present case. This was a bench trial, and the court's evaluation of the evidence indicated that it understood the evidence thoroughly and was aware of the theory of defense.

The affidavit filed by the defendant's attorney indicates that 40 hours were spent in preparing the case. The record in its entirety establishes that the defendant's attorney competently cross-examined the State's witnesses and elicited effective testimony from the defense witnesses. He took all procedural steps necessary to assert the defendant's rights at the trial and to preserve the record on appeal. In view of this, we believe that the defendant received adequate and competent representation.

■■ Finally we consider whether the sentences are excessive. The defendant correctly points out that under *People v. Chupich* (1973), 53 Ill.2d 572, 295 N.E.2d 1, the sentences in the present case must be evaluated by the standards set forth in the new Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1001—1—1 *et seq.*). Burglary is a Class 2 felony. (Ill. Rev. Stat. 1973, ch. 38, par. 19—1.) The new code provides that for all Class 2 felonies the maximum sentence shall be 20 years and that the minimum sentence shall be no more than one-third of the maximum. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(b)(3), par. 1005—8—1(c)(3).) Applying these standards to the present case, it is apparent that the defendant's sentence on the burglary charge should be 6⅔ to 20 years, rather than the 20 to 40 years that he received. The sentence in the burglary conviction is therefore reduced to 6⅔ to 20 years in the penitentiary.

The sentence on the rape charge is within the limits imposed by the Code of Corrections. In light of the defendant's prior criminal record and the nature and circumstances of the offense, we are not persuaded that this is an appropriate case for the exercise of this court's authority to reduce the punishment imposed by the trial court. *People v. Heard,* 48 Ill.2d 356.

For the foregoing reasons, we affirm the sentence imposed upon the rape charge and affirm the sentence imposed upon the burglary charge as modified by this opinion.

Judgment affirmed as modified.

DIERINGER and JOHNSON, JJ., concur.